**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

July 2, 2019

*VIA ECF (redacted)  AND HAND DELIVERY (unredacted)*
The Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Wade Hayward,* 19 CR 61 (PKC)

Dear Judge Castel:

On February 27, 2019, Mr. Hayward pleaded guilty pursuant to a written plea agreement in which the parties stipulated to a Guidelines Range between 37 and 46 months' imprisonment. Mr. Hayward and the government waived their right to appeal any sentence below or above that range, respectively. For the reasons that follow, the Court should sentence Mr. Hayward within the stipulated range to a sentence of 37 months' imprisonment.

BACKGROUND

Wade Hayward had a difficult and chaotic childhood defined in large part by his alcoholic father. His father's alcoholism drove his parents apart. Wade chose to live with his father after his parents' separation. He was raised in poverty, in a neighborhood plagued by crime and violence, in the Walt Whitman housing project in Brooklyn, New York. His mother was out of the state for a significant period. His father was not present. As Wade's mother describes in her moving letter to the Court, "yes, my husband was there physically, but mentally he was not there. He could not show our boys how to be a man, and neither could I." Exhibit A.

Re:     *United States v. Wade Hayward,* 19 CR 61

Young and unguided, Wade fell into nearly every pitfall. He failed to complete high school. He impregnated his 17-year-old girlfriend when he was 16 years old. He drank to excess and smoked marijuana daily.

At only 16 years old, Wade sustained his first criminal convictions. In February and March of 2008, alongside other boys in his neighborhood, he participated in thefts of strangers on the streets. He qualified for the diversionary CASES program but, without any support in his home, he was unable to complete it. Instead, he was sent to jail at only 17 years old. Although he was placed on probation, the underfunded, overwhelmed state probationary system provided none of the social or community services he desperately needed.

When he reached adulthood, at 18 years old, Wade tried to make his way in the world. Considering his background, it is unsurprising that he continued to stumble. His substance abuse issues worsened and he became hooked on pills and Lean—a highly addictive opioid-based concoction. ███████████████████████████████

At 20 years old, Wade sustained a robbery conviction—his first adult conviction—and served roughly a year in prison (his longest term of incarceration). At 22, he sustained another conviction related to his relatively minor role in a credit card theft ring and served four months.

Despite a childhood and young adulthood marred by addiction, disease, and criminal justice contact, there were some notable pockets of promise in Wade's life. Although Wade entered parenthood at a very young age, he flourished as a father. Wade's mother writes "Wade is dedicated to his family ESPECIALLY his daughter Ka'myra Hayward, the love of his life." Exhibit A. Ka'myra always has lived with Wade. When Ka'myra's mother relocated to Pennsylvania, the family decided it was in the child's best interest for Ka'myra to remain in the custody of Wade and his mother. Before his arrest, Wade was one of Ka'myra's primary childcare providers and responsible for getting her to and from school every day.

      Re:    *United States v. Wade Hayward,* 19 CR 61

Wade was good at being Ka'myra's dad. The relationship helped build in Wade needed-confidence that he applied to other aspects of his life. He recognized an ability and passion for childcare work. As a result, from 2010 until 2014, Wade was employed as an afterschool counselor at University Settlement House, where he earned several promotions over the course of his employment. As corroborated by Isabella Lee's attached letter, Wade also volunteered his time within his community and "always showed up early, worked hard, and carried himself in a polite, respectable manner." Exhibit B.

In early 2018, Wade began a term of parole. He was 26 years old. He genuinely wanted to make a fresh start and put behind him the mistakes of his youth. Within weeks of being paroled, he secured a job at Shake Shack, earning $13.50 an hour. He returned to his mother's apartment. He took on primary care for his daughter.

But, towards the end of 2018, Wade strayed again when his co-worker and co-defendant Anthony McCray asked Wade if he could find someone to sell McCray guns. Wade maintained contact with men from his neighborhood who were still involved in criminality and he was able to broker the sale of four firearms.

Wade was arrested on January 2019 and detained. Within weeks, he found himself in the midst of a humanitarian crisis at the MDC—an experience that clearly sent the message to Wade that the price for criminal conduct is too high to risk recidivating. For a week, Wade survived unimaginable conditions of confinement spent in the pitch black, freezing cold. His cell had no light. His unit was so frigid that even the three layers of clothes he wore did not protect him from the plunging temperatures. He wore socks on his hands but still lost feeling in his fingertips. He was on "lockdown" for 24 hour periods. He was denied showers, meals, blankets, working toilets, laundry privileges, and other necessary hygiene. The toilet in his cell did not flush and overflowed with human waste. When water ran out of the faucets, it was brown. He had no ability to communicate with the outside world. He did not receive his ▮

Re:   *United States v. Wade Hayward,* 19 CR 61

medications despite repeated pleas to the staff. The ordeal lasted seven days and six nights. Today, Wade continues to suffer with post-traumatic symptoms following his experience at the MDC during the crisis.

### The Court Should Sentence Mr. Hayward to a Term of Imprisonment At the Bottom-End of the Parties' Stipulated Range

#### A. The Court Should Adopt the Parties' Guidelines' Calculations.

The Probation Department arrives at a far higher advisory range than the one agreed to by the government. Based on its calculations, the Probation Department recommends a sentence of 60 months—multiples above the parties' stipulated range. The Probation Department's calculation is driven largely by Mr. Hayward's youthful offender convictions for conduct committed when he was 16 years old (PSR, ¶¶ 48 and 49). While the parties attribute no criminal history points for these dated, juvenile offenses (nor do we use them to increase Mr. Hayward's base offense level) the Probation Department relies on the convictions to place Mr. Hayward in a Criminal History Category V and to apply U.S.S.G. § 2K2.1(a)(2)'s higher base offense level.[1]

As an initial matter, the defense has been denied access to the records that support the Probation Department's calculation. As the Court may recall, I sought Court intervention to get the records but the Probation Department produced very few documents and none that confirmed that Mr. Hayward was resentenced on the Y.O. offenses in 2018. (If he had not been resentenced in 2018, then the 2008 convictions would be too old to count under the Guidelines. *See* U.S.S.G. § 4A1.2(d)(2)). By memo to the Court, the Probation

---

[1] The Probation Department also applies a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(4)(A) because, it contends, "one of the firearms involved in the offense had been previously stolen." PSR, ¶ 38. However, in the parties' binding plea agreement, the government stipulated that it does not have proof by the preponderance standard to support such an enhancement.

The Honorable P. Kevin Castel                                                            July 2, 2019
Page 5 of 7

      Re:    *United States v. Wade Hayward,* 19 CR 61

Department took the position that it could not produce the documents even with a Court Order.

Even if the records do exist and the Court relies on them without the defense's review of them, the resulting criminal history category is overstated. Y.O. convictions typically are treated less harshly in the Guidelines in recognition that crimes committed as a youth are less indicative of an individual's poor character or likelihood of recidivism than adult convictions. The Probation Department's reliance on these convictions in its calculations and recommendation results in a counterintuitive and overly harsh result.

### B. The § 3553(a) Factors Support a Sentence of 37 Months' Imprisonment.

The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. 18 U.S.C. § 3553(a)(2). To arrive at such a sentence, in addition to the Guidelines, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (4) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1), (a)(3)-(7). While the Court must calculate the applicable Sentencing Guidelines range, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

A prison term of 37 months is more than three times longer than any prior sentence Wade has served. And independent of the significant, additional time he faces, Wade's conditions of confinement already have been deeply punitive. While prison on a standard day has a profound deterrent effect, Wade's experience during the crisis was even more chastening. For these reasons, Judges in the Southern and Eastern Districts have been imposing downward variances for defendants, like Wade, who were confined at the MDC during the

The Honorable P. Kevin Castel                                                July 2, 2019
Page 6 of 7

Re:     *United States v. Wade Hayward,* 19 CR 61

crisis. In a variance to time served in a recent case with an advisory Guidelines range of 18-24 months, Judge Chen in the Eastern District noted that "these circumstances were unacceptable and deplorable and certainly not fitting of…conditions of confinement in this country and certainly not in this District." *United States v. Bruney, et al.,* 18 Cr. 542 (PKC) (E.D.N.Y.), Sentencing Transcript at 24. She called this a "significant mitigating factor" and went on to say that "punishment has been extreme in this case because of the conditions already endured by this defendant as well as other inmates at the MDC [,] so I think that his sentence…in terms of punishment has been longer than the actual time…he is going to serve." *Id.* at 24-25. Judge Furman, in imposing a below-Guidelines sentence, compared the situation to something "that one associates with a third world country and not a country like this," and asserted that "nobody in detention, whether convicted, not convicted, awaiting sentencing, should have to endure that as the detainees did at the MDC." *United States v. Ozols,* 16 Cr. 692 (JMF) (S.D.N.Y.), Sentencing Transcript at 31. And, my colleagues at the Federal Defenders report that Your Honor and Judge Kaplan also referenced the MDC power outage as a mitigating factor for purposes of imposing sentence.

The message of deterrence has been received loud and clear by Wade and, at a point in his life, when he was naturally maturing out of the poor, infantile decision making that led him into the offense conduct and into prior conduct that accounts for his criminal history. Wade had a false start when released on parole in 2018 but he is now ready to do it right. And, when he is released, he will be supported by his mother and motivated by his daughter. He hopes to pursue positive, productive wants, including returning to childcare work—a field from which he derived self-worth and value. In short, as articulated by Wade's mother,

> It is time for Wade to take responsibilities for his actions and move forward in a positive direction for himself and his daughter. Wade has family that will support him 100% providing that he will come home and get on the right track. From our recent previous conversations, Wade has discussed lessons learned and looks

The Honorable P. Kevin Castel                                                                                July 2, 2019
Page 7 of 7

       Re:    *United States v. Wade Hayward,* 19 CR 61

forward to moving on in a positive way.

## CONCLUSION

Against this backdrop, a sentence at the bottom-end of the parties' stipulated range is sufficient, but no greater than necessary.


Respectfully submitted,
/s/ Julia Gatto
Julia L. Gatto, Assistant Federal Defender
(212) 417-8750


cc:    Lindsey Keenan (via ECF (redacted) and Hand Delivery (unredacted))